J-A27002-24
J-A27003-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| LYSTN, LLC, INTEGRATIVE GREEN SOLUTIONS, INC., FOOD FOR LIFE TRUCKING AND LOGISTICS CO., BIODYNAMIC FARMS, LLC | : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | |
| | : | No. 1555 MDA 2023 |
| ROXANNE STONE, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF JACQUELINE HILL (DECEASED), INITIAL, LLC, CONSTANZIA LEVITSKY, AND COCOVINNA, LLC | : : : : : : : : | |
| Appellants | : : : : : : : | |
| APPEAL OF: ROXANNE STONE, INDIVIDUALLY | : : | |

Appeal from the Order Entered October 12, 2023
In the Court of Common Pleas of Berks County Civil Division at No(s):
21-12980

| | | |
|---|---|---|
| ROXANNE STONE, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF JACQUELINE HILL | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| LYSTN, LLC, FOOD FOR LIFE TRUCKING AND LOGISTICS COMPANY, INTEGRATIVE GREEN SOLUTIONS, INCORPORATED, BIODYNAMIC FARMS, LLC   LYSTN, LLC, FOOD FOR LIFE TRUCKING AND LOGISTICS COMPANY, INTEGRATIVE GREEN SOLUTIONS, | : : : : : : : : : | No. 1575 MDA 2023 |

J-A27002-24
J-A27003-34

INCORPORATED, BIODYNAMIC        :
FARMS, LLC                      :
                                :
                                :
                                :
          v.                    :
                                :
                                :
                                :
ROXANNE STONE, INDIVIDUALLY     :
AND AS EXECUTRIX OF THE ESTATE  :
OF JACQUELINE HILL, AND INITIAL,:
LLC, CONSTANZIA LEVITSKY AND    :
COCOVINNA, LLC                  :
                                :
                                :
                                :
APPEAL OF: JESSE ERVIN KING

Appeal from the Order Entered October 13, 2023
In the Court of Common Pleas of Berks County Civil Division at No(s):
21-12980

ROXANNE STONE, INDIVIDUALLY     :    IN THE SUPERIOR COURT OF
AND AS EXECUTRIX OF THE         :         PENNSYLVANIA
ESTATE OF JACQUELINE HILL       :
                                :
                                :
                                :
          v.                    :
                                :
                                :
LYSTN, LLC, FOOD FOR LIFE       :    No. 1574 MDA 2023
TRUCKING AND LOGISTICS          :
COMPANY, INTEGRATIVE GREEN      :
SOLUTIONS, INCORPORATED,        :
BIODYNAMIC FARMS, LLC           :
                                :
                                :
                                :
APPEAL OF: ROXANNE STONE,       :
INDIVIDUALLY                    :

Appeal from the Order Entered October 13, 2023
In the Court of Common Pleas of Berks County Civil Division at
No(s):  21-11790

- 2 -

J-A27002-24
J-A27003-34

| | | |
|---|---|---|
| ROXANNE STONE, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF JACQUELINE HILL | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| LYSTN, LLC, FOOD FOR LIFE TRUCKING AND LOGISTICS COMPANY, INTEGRATIVE GREEN SOLUTIONS, INCORPORATED, BIODYNAMIC FARMS, LLC   LYSTN, LLC, FOOD FOR LIFE TRUCKING AND LOGISTICS COMPANY, INTEGRATIVE GREEN SOLUTIONS, INCORPORATED, BIODYNAMIC FARMS, LLC | : : : : : : : : : : : : | No. 1582 MDA 2023 |
| v. | : : : : : | |
| ROXANNE STONE, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF JACQUELINE HILL, AND INITIAL, LLC, CONSTANZIA LEVITSKY AND COCOVINNA, LLC | : : : : : : : : | |
| APPEAL OF: JESSE ERVIN KING | | |

Appeal from the Order Entered October 13, 2023
In the Court of Common Pleas of Berks County Civil Division at
No(s):  21-11790


BEFORE:  LAZARUS, P.J., KUNSELMAN, J., and McLAUGHLIN, J.

MEMORANDUM BY LAZARUS, P.J.:                    **FILED: JULY 1, 2025**

- 3 -

Roxanne Stone (Stone) (at 1574 MDA 2023 & 1555 MDA 2023), individually, and Jessie Ervin King (King) (at 1582 MDA 2023 & 1575 MDA 2023), appeal from the orders, entered in the Court of Common Pleas of Berks County, finding them in willful contempt for violating the trial court's preliminary and permanent injunctive orders.[1] After careful consideration, we affirm.

In 2009, the now-deceased Jacqueline Hill[2] co-founded Lystn, LLC (Lystn), a Delaware company that develops, formulates, manufactures, sells, and distributes fermented raw pet food—in particular, its proprietary pet food, ANSWERS™. Food for Life Trucking and Logistics Company (F4L), Integrative Green Solutions, Inc. (IGSI), and Biodynamic Farms, LLC (collectively, Lystn-affiliated companies), are all controlled by Lystn or under common control by Lystn. In August 2009, Stone was hired as an independent consultant for Lystn, and then, later, became a Lystn employee.

In April 2010, Stone and Hill executed an LLC Operating Agreement (Agreement) for Lystn that designated its members[3] were permitted to serve

___

[1] **See** 1402/1403 MDA 2021 and 1254/1255 MDA 2022, 1255 MDA 2022 (appeals involving trial court's grant of preliminary and permanent injunctive relief in matter).

[2] Hill passed away in September 2022.

[3] Members were designated as being in "Class I" or "Class II." Class I members were permitted to make capital contributions "both in cash and in the form of an assignment of intellectual property, business and industry contacts, and goodwill," actively participate in the operation of the company's
*(Footnote Continued Next Page)*

a "transfer notice" if they wished to resign and transfer their membership interest to another member. *See* Complaint (21-11790), 7/21/21, at ¶¶ 11-12, 72.

In February 2021, Hill and Stone gave a transfer notice to four other Lystn members and to Lystn's corporate counsel. *Id.* at ¶ 16. In the notice, Hill and Stone stated that they wanted to transfer their membership interests in Lystn and resign as a managing member and employee, respectively. *Id.* at ¶ 17. Under the Agreement, once a transfer notice has been received, Lystn and the transfer-member "shall negotiate in good faith to determine the purchase price for the [transfer-member's] membership interest." Agreement, 4/12/10, at ¶ 7.7.1.

On March 5, 2021, invoking the "Buyout Provision" under the Agreement, the Lystn members voted for Lystn to exercise a purchase option for Hill's and Stone's membership interests. On April 26, 2021, Stone and Hill resigned from Lystn and all of its affiliated companies. Stone and Hill publicly announced their resignation from Lystn on May 4, 2021.

In May 2021, Hill and Stone organized Appellant Initial, LLC (Initial), a direct competitor of Lystn, which operates under the name "Kure Pet Food"

---

business, and receive compensation and benefits. *Id.* at ¶ 12. Class II members, on the other hand, were not entitled to make capital contributions other than in cash or participate actively in the operation of the company's business or receive compensation or benefits. *Id.* Under the Agreement, "all Members may, notwithstanding this [A]greement, engage in whatever activities they choose, provided the same are not competitive with [Lystn]." *Id.* at ¶ 13.

- 5 -

(Kure)."[4] Initial is a collective of five Amish farmers—Steven Fisher, Appellant King, David Esh, John King, and Samuel Stoltzfus (collectively, Amish Farmers)—who each operate through their own companies, Ultra Design (Fisher), Rocky Ridge Goat Dairy (Appellant King), and Lykens Valley Creamery (Esh/John King/Stoltzfus). The Amish Farmers were all former, long-time suppliers of the Lystn Parties. The Lystn Parties alleged that Initial manufactured Kure's products using the same formulas and processes—involving proprietary and confidential business information—developed by Stone and Hill while they were working for Lystn.

On July 21, 2021, Stone and Hill filed a lawsuit at 21-11790 (First Action) against Lystn and the Lystn-affiliated companies (collectively, Lystn Parties) seeking declaratory and injunctive relief asserting that the non-compete clause was unenforceable as a matter of law as applied to its members who are not employed by the LLC and do not participate in its management. *See* Complaint at 21-11790, 7/21/21, at ¶ 45.

On August 19, 2021, Lystn and the Lystn-affiliated companies filed a separate action at 21-12980 (Second Action) against Stone, Hill, and Initial. On the same date, Lystn filed a petition for special and injunctive relief seeking to enjoin Initial from manufacturing, distributing, and/or selling raw and/or fermented pet food products that competed with Lystn's products and also seeking to prohibit Stone and Hill from consulting with Initial or any other raw

---

[4] The Kure/Initial venture eventually led to the creation of Solutions Pet Products, LLC (Solutions), a company partially owned by Chelsea Kent.

pet food company.  The Lystn complaint alleged various statutory and common-law claims arising from misappropriation of Lystn's trade secrets, tortious interference with contractual relations, and breaches of noncompete obligations arising from the formation of Kure while Appellants were members, shareholders, and/or suppliers of Lystn.

On October 21, 2021, the trial court entered a preliminary injunction against Stone, Hill, and Initial, which they immediately appealed to this Court. ***See Stone v. Lystn, LLC, et al.***, 1402 MDA 2021, 1403 MDA 2021, 1254 MDA 2021, & 1255 MDA 2021 (the Preliminary Injunction appeals); ***see also supra*** at n.1.  The trial court, following argument by the parties, entered an order on October 22, 2021, denying the parties' joint-emergency application to suspend the preliminary injunction pending appeal.  On October 25, 2021, Stone, Hill, and Initial filed an "Emergency, *Ex Parte* Application for Suspension of Preliminary Injunction Pending Appeal," docketed as a Petition for Stay, in this Court.

On October 27, 2021, our Court issued an order temporarily staying the preliminary injunction and instructing the trial court to provide this Court, within ten days, an opinion explaining why it denied Appellant's application for stay pending appeal and motion for reconsideration.  ***See*** Order, 10/27/21.  On November 5, 2021, the trial court issued its opinion explaining its reasons for denying the parties' petition for stay pending appeal.  ***See*** Opinion, 11/5/21, at 1-7.  On November 10, 2021, Lystn filed an emergency application to vacate the temporary stay and reinstate the preliminary injunction pending

- 7 -

appeal. On November 10, 2021, our Court issued an order denying Stone and Hill's petition for stay and granting Lystn's application to vacate stay and reinstate the preliminary injunction, effective immediately. **See** Order (71 MDM 2021), 11/10/21 ("This Court's October 27, 2021 [] order that temporarily stayed the trial court order dated October 20, 2021, and entered October 21, 2021, is **VACATED**.") (emphasis in original).

Stone, Hill, and Initial petitioned for reconsideration of our Court's decision to vacate the stay, which was denied on November 22, 2021.[5] On March 29, 2022, the Lystn Parties filed a contempt petition (First Contempt Petition) against Stone, Decedent Hill, and Initial (collectively, First Contempt Petition Defendants), alleging they had violated the preliminary injunction. On April 8, 2022, the Amish Farmers filed a petition to intervene in the matter to protect their financial interests related to the Lystn Parties purchasing their goat's milk. **See** Pa.R.C.P. 2327(4). The trial court denied the intervention motion. On July 5, 2022, the trial court denied the First Contempt Petition, noting, however, that Stone and Hill's conduct "came dangerously close to the line" of contempt. Order, 7/5/22.

---

[5] **See also Pa. Public Util. Com. v. Process Gas**, 467 A.2d 805, 808-09 (Pa. 1983) (to succeed on stay pending appeal, petitioner must show: (1) strong showing of likelihood of prevailing on merits of appeal; (2) they will suffer irreparable injury if not granted stay; (3) stay will not substantially harm other interested parties; and (4) stay will not adversely affect public interest).

From August 2 through August 12, 2022, the trial court held a jury trial on the merits of the First and Second Actions. On August 16, 2022, the jury returned a verdict finding: (1) Lystn had a proprietary interest in the formulas of its pet food products; (2) Stone, Hill, and Initial misappropriated Lystn's trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act[6] (PUTSA); (3) Stone and Hill breached covenants contained within their Lystn shareholder member agreements; (4) Stone and Hill interfered with Lystn's actual or prospective contractual relations with employees, contractors, suppliers, and/or distributors; (5) Lystn sustained harm because of the Kure Defendants' unlawful conduct; and (6) Stone and Hill were entitled to monies owed to them from the buyout of their member shares.

On November 21, 2022, the Lystn Parties filed a second contempt petition (Second Contempt Petition) alleging again that Stone and Hill were violating the terms of the preliminary injunction. Specifically, the petition alleged that the First Contempt Petition Defendants had violated the October 2021 preliminary injunction by "enter[ing] into direct competition with the Lystn Companies as part of the 'team' at [Solutions,] with the cooperation of Initial." Contempt Petition, 11/21/22, at 2. Prior to deciding the contempt

_____

[6] *See* 12 Pa.C.S.A. §§ 5301, et seq.

issue, the court granted the Lystn Parties' petition to grant a permanent injunction on December 12, 2022.[7]

In January and March 2023, the trial court held two days of contempt hearings. At the end of the first day of hearings, the trial judge permitted Lystn to amend its petition to add King as an additional respondent/contemnor. On February 21, 2023, the Lystn Parties formally filed an amended Second Contempt Petition, now alleging that the Second Contempt Petition Defendants were violating both the preliminary and permanent injunctions where "Stone has [] entered into direct competition with the Lystn Companies as part of the 'team' at Chelsea Kent's Solutions Pet Products[, LLC (Solutions)], with the full cooperation and assistance of Initial and its individual owners." **See** Lystn's Amended Second Contempt Petition, 2/21/23, at 2.

On October 12, 2023, the court entered an order—listing both trial court docket numbers in the heading—granting, in part, and denying, in part, the Lystn Parties' amended contempt petition. The order specifically finds Stone

_____

[7] On August 12, 2022, the jury returned a verdict in favor of the Lystn Parties. Following trial, the court entered the instant permanent injunction in favor of the Lystn Parties and against Stone, Hill, and Initial, concluding that Hill and Stone had breached Lystn's non-compete provision in the Agreement and that Stone, Hill, and Initial had willfully and wantonly misappropriated Lystn's propriety formulas in violation of the PUTSA. **See** Permanent Injunction Order, 12/12/22, at 1-2. On January 23, 2023, the court molded the jury verdict. On February 3, 2023, the court entered judgment on the molded verdict.

- 10 -

and King[8] to have been "in willful **CONTEMPT** of the [c]ourt's [p]reliminary [and p]ermanent injunction[s.]" Contempt Order, 10/12/23, at 2 (emphasis in original). The order also lists purge conditions[9] that Appellants may satisfy on or before October 27, 2023, and imposes sanctions, in the form of reasonable attorneys' fees and costs, totaling $20,000.00,[10] to be paid on or

_____

[8] Although Lystn requested that Kent be found in contempt as the principal of Solutions, because the petitioners did not perfect attachment, she was not able to be brought into court for the proceedings. **See** Trial Court Opinion, at 7 n.11.

[9] The contempt order provides the following purge conditions:

   a. [] Stone shall cease all activities for and on behalf of Solutions [] prohibited by the [p]ermanent [i]njunction, including the development of formulas and/or food programs for products identical or substantially similar to those used by the Lystn Companies, including specifically, but not limited to, the existing raw beef, chicken, and/or pork diet offered by Solutions, which feature whey fermentation as a protective inoculant and have substantially the same characteristics as the raw diet products offered by the Lystn Companies;

   b. [] Stone shall remove any attribution or reference to her role as co-formulator and/or Principal Food Scientist of Solutions' pet food products, including the existing raw, whey fermented meat products discussed in the preceding paragraph; for those outlets under the control of others, she shall formally demand such attributions or references be removed immediately via a verifiable method (such as personal service or restricted-delivery certified mail or other method where evidence of which can be provided to the [c]ourt)[.]

Contempt Order, 10/12/23, at 3.

[10] The trial court found Stone and Hill jointly and severally liable for the total amount, **id.** at 4 n.3, and ordered them to split the payments between two law firms—$11,310.00 to the law firm of Wolf, Baldwin & Associates, and the
*(Footnote Continued Next Page)*

before November 22, 2023. *See* Order, 10/12/23, at 3-4. Finally, the order states that the Estate of Jaqueline Hill and any of the other Amish farmers associated with Initial are not found to be in contempt. *Id.* at 2. Notably, the order specifies that "the [p]ermanent [i]njunction remains in place, unchanged, with full force and effect unless and until dissolved by a court of competent jurisdiction." *Id.* at 5.[11]

Stone, individually, filed separate, timely notices of appeal at trial court dockets #21-11790 and #21-12980 from the trial court's contempt order.[12] *See Stone v. Lystn, LLC, et al.*, 1574 MDA 2023 & 1555 MDA 2023, respectively. King, individually, filed a timely notice of appeal at trial court

_____

remaining $8,690.00 to the law firm of Sodomsky and Nigrini. *See* Order (Sanctions-Attorneys' Fees), 10/12/23, at ¶¶ 13-14.

[11] On November 6, 2023, the trial court held a compliance hearing to determine if contemnors had satisfied the purge conditions. The court found that Stone and King had, in fact, satisfied the conditions and that there had been no further violations. *See* Trial Court Opinion, 3/1/24, at 8.

[12] Typically, contempt orders that expressly give contemnors the ability to purge the contempt are deemed interlocutory and not appealable because the contemnor "has yet to suffer harm or penalty." *See Sonder v. Sonder*, 549 A.2d 155, 160 (Pa. Super. 1988) (en banc). However, the instant contempt order imposed counsel fees in addition to purge conditions. Thus, we find the order final and immediately appealable. *See Rhodes v. Pryce*, 874 A.2d 148, 153 (Pa. Super. 2005) (en banc) (concluding civil contempt order, that included purge condition, but also ordered contemnor to pay counsel fees, final and appealable).

- 12 -

dockets #21-11790 and #21-12980, *see Stone v. Lystn, LLC, et. al.*, 1582

MDA 2023, which he later amended. *See id.*, 1575 MDA 2023.[13]

On appeal, Stone raises the following issues for our consideration:

(1) [T]he trial court lacked jurisdiction or authority to hold [] Stone and [] King in contempt and to enter sanctions, on the expired [p]reliminary [i]njunction of October 20, 2021[,] and the vacated [p]ermanent [i]njunction of December 12, 2022.

(2) On the merits, the trial court erred [] or abused its discretion [] in holding [] Stone and [] King in contempt of the [p]reliminary [i]njunction of October 20, 2021[,] and of the [p]ermanent [i]njunction of December 12, 2021.

(3) The trial court erred [] or abused its discretion in the sanction that it imposed on [] Stone and [] King for such contempt of the [p]reliminary [i]njunction of October 20, 2021, and of the [p]ermanent [i]njunction of December 12, 2022, including that the award of attorneys' fees is unreasonable, excessive, or not based upon any relevant factors articulated in *Sutch v. Mem'l Hosp.*, 142 A.3d 38 (Pa. Super. 2016).

Stone's Brief, at 6-7. King raises the following issues on appeal:

(1)    Did the trial court err by proceeding with the contempt hearing as if King were a proposed contemnor even though he had never been properly served with the [p]etition for [c]ontempt and no relief was sought therein against him

---

[13] Because King's notice of appeal contained more than one docket number, in violation of *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018), our Court instructed King to file an amended notice of appeal properly including the sole trial court docket number at which he appealed, 21-12980. By order, our Court consolidated as joint appeals the appeals at 1555 MDA 2023 & 1575 MDA 2023 with the contempt order entered on docket 21-12980. Our Court also consolidated as joint appeals the appeals at 1574 MDA 2023 & 1582 MDA 2023 with the contempt order entered on docket 21-11790. Although Initial is only a party at trial court docket #21-12980, we have consolidated all four appeals, as they involve the same issues. *See* Pa.R.A.P. 513. Counsel for Stone relies on the same arguments and adopts those arguments, by reference, in King's separate brief. *See* Stone's Brief, at 32-33.

such that he lacked notice of possible contempt against him personally?

(2) Did the trial court err by *sua sponte* permitting the [Lystn Parties] to amend their [p]etition for [c]ontempt after the first day of the contempt hearing to add allegations therein supporting alleged contempt against him, which amended [p]etition was also never properly served upon him?

(3) Did the trial court err by determining that [] King is bound by the injunctions even though he was not a party to the action, was previously denied intervention, and is not specifically named in or restricted by the injunctions?

King's Brief, at 1-2.

The power to punish for contempt is a "right inherent in the courts and is incidental to the grant of judicial power under the Constitution." **In re Estate of Disabato**, 165 A.3d 987, 992 (Pa. Super. 2017). Contempt may be either civil or criminal. "The characteristic that distinguishes civil from criminal contempt is the ability of the contemnor to purge himself of contempt by complying with the court's directive." **Sinaiko v. Sinaiko**, 664 A.2d 1005, 1009 (Pa. Super. 1995). "If [the contemnor] is given an opportunity to purge himself before imposition of punishment, the contempt [o]rder is civil in nature. [However, i]f the purpose of the [o]rder is to punish despite an opportunity to purge, the [o]rder is criminal in nature." **Id.** Finally, in reviewing an adjudication of contempt, the appellate court places great reliance on the sound discretion of the trial judge. **Goodman v. Goodman**, 556 A.2d 1379, 1391 (Pa. Super. 1989).

Stone first contends that the trial court lacked jurisdiction to hold her in contempt where the preliminary injunction had expired, and the permanent injunction had been vacated at the time the court entered its contempt order.

As previously stated, in the preliminary injunction appeals, our Court temporarily stayed the preliminary injunction for a total of two weeks—from October 27, 2021 until the stay was vacated on November 10, 2021. **See** Order, 10/27/21; Order 11/10/21. Moreover, in response to our Court's June 22, 2023 order in 115 MDA 2023, 116 MDA2023, and 428 MDA 2023, to "correct the trial court record and dockets to accurately reflect the proceedings, filings, and judgments relative to each trial court docket," as well as Stone, Hill, and Initial's motion to correct the docket and enter judgment, the trial court vacated the permanent injunction *at trial court docket 21-11790 only*, on August 30, 2023, struck off the judgments in favor of Lystn and against Stone, Hill, and Initial, and corrected the judgments in favor of Hill and Stone and against the Lystn Parties to reflect that their liability is joint and several. However, on the correct docket, 21-12980, the court clearly stated that "[n]othing in this [o]rder shall be construed as vacating or modifying the [o]rder for [p]ermanent [i]njunction filed on 1/10/2023." Order at 21-12980, 8/30/23.

Instantly, the contempt order was issued on October 12, 2023—almost two years after the stay on the preliminary injunction was lifted and 10 months after the permanent injunction was ordered. Moreover, the trial court explicitly states in the contempt order that, on docket 21-12980, "[t]he

[p]ermanent [i]njunction remains in place, unchanged, with full force and effect unless and until dissolved by a court of competent jurisdiction." Contempt Order, 10/12/23, at 5. Thus, we find meritless Stone's contention that the permanent injunction was "vacated . . . and any such findings of contempt were void and without legal effect." Stone's Brief, at 36.

However, we agree with Stone's contention that "the trial court [only] had the power to hold [her] in contempt for violations of the permanent injunction order," because at the time the court entered its contempt order, the preliminary injunction had already been rendered moot by the entry of the permanent injunction. *See Stone v. Lystn, et al.*, 1402 MDA 2021, 1403 MDA 2021, 1254 MDA 2022, 1255 MDA 2022 (where preliminary injunction terminates upon issuance of permanent injunction, any claims arising from issuance of preliminary injunction moot). *See also* Trial Court Opinion, 10/12/23, at 8 ("The [p]reliminary [i]njunction remained in effect until December 12, 2022, when the [c]ourt entered an [o]rder for [p]ermanent [i]njunction[.]).[14]

Stone next contends that the trial court erred in finding her and King in contempt of the court's permanent injunctive order. Stone asserts that because the Lystn Parties never admitted their pet food formulas into the record at trial or the contempt hearings, the "[p]ermanent [i]njunction was

_____

[14] Thus, we will confine our review to whether the court properly found Stone and King in contempt of the *permanent* injunction.

- 16 -

incapable of execution" because there was no "substantially similar" standard in the pet food industry that definitively and clearly communicated to her and King what they were prohibited from doing. Stone's Brief, at 40-41. Specifically, Stone claims that the court's order was not definite or specific enough to let her know what conduct was prohibited by the injunction. We disagree.

> For a person to be found in civil contempt, the moving party must prove that: (1) the contemnor had notice of the specific order or decree that he disobeyed; (2) the act constituting the violation was volitional; and (3) the contemnor acted with wrongful intent. ***Marian Shop, Inc. v. Baird***, [] 670 A.2d 671, 673 (Pa. Super. 1996). The order alleged to have been violated "must be *definite, clear, and specific*[—]leaving no doubt or uncertainty in the mind of the contemnor of the prohibited conduct" and is to be strictly construed. ***Id.*** (emphasis in original).

***Gunther v. Bolus***, 853 A.2d 1014, 1017 (Pa. Super. 2004).[15] "On appeal from a court's order holding a party in contempt of court, our scope of review is very narrow." ***Garr v. Peters***, 773 A.2d 183, 189 (Pa. Super. 2001). "We are limited to determining whether the trial court committed a clear abuse of discretion." ***Id.***, citing ***Mueller v. Anderson***, 609 A.3d 842, 842-43 (Pa. Super. 1992).

The relevant language of the permanent injunction, as it applies to Stone, is as follows:

---

[15] Stone testified that she was aware of both the preliminary and permanent injunctive orders. ***See*** N.T. Contempt Hearing, 1/24/23, at 61. Thus, notice of the order is not at issue.

> []Stone [is] permanently enjoined and prohibited from consulting for any business [f]or [Hill or Stone] regarding the development of formulas or food programs for products that are identical or substantially similar to those used by Lystn, including fermented goat's milk, raw fermented meat products, raw fermented kefir, fermented bone broths and stocks, and/or fermented tea/kombucha for animal consumption[.]

Permanent Injunction, 12/12/22, at 2.[16]   The relevant language of the permanent injunction, as it applies to King, is as follows:

> [] King shall cease production of Solution's existing whey fermented raw diet products, including the beef, chicken, and/or pork offerings as presently advertised and formulated.

Permanent Injunction, 12/12/22, at 3.

The trial court notes that it was "careful to carve out non-offending conduct [in its permanent injunctive order], including the ability of Stone [] to pursue employment, consulting, and/or business opportunities **that do not relate to the production or marketing of raw fermented pet food products 'identical or substantially similar in formulation to those sold by the Lystn Companies**.'"  Trial Court Opinion, 10/12/23, at 7-8 (emphasis added), citing Permanent Injunction, 12/12/22, at 5.  In particular, the court found that Solution's meat products were so "substantially similar" to those offered by Lystn that a reasonable consumer might "find no practical distinction among them."  *Id.* at 25.  To support that finding, the court cites to evidence presented at the contempt hearing that showed

> [B]ut for a number of spice and vegetable substitutions[,] the meat products were virtually identical in terms of [] core

---

[16] The jury found that Stone had breached her contractual non-compete covenant with Lystn.  *Id.* at 1.

ingredients, listed in descending order, starting with the most prevalent ingredient, and ending with the least prevalent [ingredient,] ratios of protein to fat/calcium to phosphorous, [] guaranteed analysis, and [] the use of whey fermentation as an included and advertised product feature.

*Id.* at 25-26. The court also noted that Solutions did not exist before Kent approached Stone and that Kent "relied on the same people the [c]ourt had restrained from providing some of the same products they now formulate and create for Solutions." *Id.* at 26.

Amy Pierce, Lystn's outside counsel, testified at the contempt hearing that the Solutions website listed Stone as the company's "Principal Food Scientist" and also stated that the pet food company's "formulations are a collaboration between Chelsea Kent and Roxanne Stone." N.T. Contempt Hearing, 1/24/23, at 17-18. Pierce also testified that Solutions website states its products are sourced from Amish farms in rural Pennsylvania and that the company's Instagram page indicates that its packaging facility is privately owned by small family farmers. *Id.* at 19-20. Finally, Pierce testified that the Solutions website advertised that it sells raw cultured goat milk as well as chicken, pork, and beef products. *Id.* at 23. Moreover, it states that its beef product lists goat milk whey as a recipe ingredient. *Id.*

Instantly, Stone testified that she began her full-time employment with Solutions on October 10, 2022, that she made approximately $42.00/hour, and that her job duties included reading scientific publications, educating retailers on Solutions' products, overseeing "regulation and quality control," and registering products in different states. *Id.* at 66, 75, 79-80; *id.* at 123

(Stone testifying she was Solutions employee, not consultant). Quality control, according to Stone, included reviewing the laboratory analysis and ingredients on the food labels. *Id.* at 96-97. Despite these job responsibilities, Stone testified that she never signed any food safety plans and had no idea who drafted Solutions' food safety plans. *Id.* at 72-73. Although listed as the "Principal Food Scientist" on Solutions' website, Stone denied collaborating with Kent to formulate Solutions' products, testified that she did not know who formulated Solutions' pet food products, and also had no idea who determined what ingredients would go into Solutions' pet food, including the correct ratio of ingredients to optimize pet health benefits. *Id.* at 62-65, 89-92, 132.

To show how the Solutions' product line differed from that of Answers, Stone testified that Solutions carried the following milk and cheese products that Answers did not: (1) four different goat milk products, including one with turmeric and ginger; (2) a milk product with duck eggs in the recipe; (3) two butter teas containing peppermint, dandelion, and chicory root; and (4) cheese with herbs that controlled parasites and inflammation. *Id.* at 143-145. Stone also testified that Solutions used fermented raw goat milk that was inoculated before being packaged in cartons for retail sale. *Id.* at 158. Solutions meat products were fermented with whey. *Id.* at 159.

King, the majority owner of Rocky Ridge Goat Dairy and co-owner of Initial,[17] previously worked for Answers, where he bottled fish stock. *Id.* at 166-67. King testified at the contempt proceeding that, in 2022, he signed a service contract with Solutions wherein he initially provided the company "[m]ilk and bottle[d] the [raw goat[18]] milk and also process[ed] meat." *Id.* at 164. Since signing that contract, King has increased the products he supplies to Solutions, now also making four different milks, processing more meats (including mixing in the whey to the meat) for Solutions, "doing [the] herbal blends[,] bottling the [pork, chicken, and fish] jiggles[19, and] providing cold storage and logistics[.]" *Id.* at 166. King also testified that the same farms that supplied raw goat milk to Answers supply milk to Solutions. *Id.* at 169. King testified that he "fe[lt]" that *all* of the milk produced by Solutions

---

[17] In May 2022, due to the issuance of the preliminary injunction in the instant matter, Initial has approximately one million dollars' worth of raw goat milk product sitting in cold storage unable to be used. *Id.* at 170. As a result, Initial was no longer doing business at the time of the contempt hearing. Accordingly, Lystn decided not to name Initial as a defendant in its contempt petition.

[18] King testified that other farmers from local farms also provided Solutions raw goat milk for their pet food products. *Id.* at 168. He specifically provided Solutions goat nog (honey, cinnamon and eggs), belly butter tea, cooked herbal tea, and tex sauce (goat milk, turmeric and ginger juices). *Id.* at 385. King also testified that he prepared and processed chicken and beef for Solutions. *Id.* at 390.

[19] King testified that the term "jiggles" was similar to a stock or broth, but there were some differences among the three terms. *Id.* at 202. While King testified that he believed jiggles were fully cooked and not fermented or raw, he also admitted that Stone and Kent would know better. *Id.* at 203.

is different than the milk produced by Answers. *Id.* at 184 (emphasis added).

King also testified that he is the manufacturer for Kent at Solutions and that

Initial actually paid for the construction of Solutions' meat plant, located on

Rocky Ridge Dairy's property. *Id.* at 200, 216. Finally, King testified that

both Answers and Solutions put their beef product in casing. *See id.* at 392-

93.

Derrick Hill, son of the late-Jacqueline Hill and a founder of and former

Chief Financial Officer for the Lystn Companies, who had been a Lystn

employee for 14 years at the time of the instant matter, testified that the

formula details on Solutions' website—specifically the advertising, packaging,

and ingredient panels of the chicken, pork, and beef products they sold—were

substantially similar to Answers' pet food products. *Id.* at 236-398. *See also*

*id.* at 239-40 (Hill testifying manner in which Solutions ferments with whey is

similar to Answers' process); *id.* at 263-64 (Hill testifying Solutions goat-milk

product, raw meat (chicken, beef and pork) diets and gelatins and stocks are

similar to Answers formula-wise); *id.* at 264 (Hill testifying honey and

cinnamon in Solutions' goat milk also contained in Answers' product and

Answers recommended eggs be added to goat milk which Solutions also used

in their formula); *id.* at 300 (Hill testifying, other than Answers, Solutions is

only other pet food company that puts "raw fermented goat milk inoculated

with cultures in a cardboard container for sale"); *id.* at 354-55 (Fisher

testifying Solutions' stock was cooked "in a similar way" to the stock he made

for Answers that was used as base for its jiggles and that he sometimes used

whey to ferment fish for Answers). Hill also testified that Solutions was the only pet food company other than Answers that used fermented ingredients as a pathogen inhibitor for their meat product. *Id.* at 299.

While Hill admitted that he did not perform product testing, he testified that as a founding member of Lystn's pet food brand, Answers, he knew the nutritional information of Lystn's products and what makes them especially unique in the pet food industry.[20] *Id.* at 268. Specifically, Hill testified that at the time he incorporated Answers, it was the only pet food company that advertised its pet food had a 1:1 protein-to-fat ratio. *Id.* at 227. *See id.* at 229 (Hill testifying he heard Kent on podcast state Solutions' pet food formulated with 1:1 protein-to-fat ratio); *id.* (Hill testifying after looking at eight other raw pet food brands, Solutions was only other pet food company on market, other than Answers, that had 1.25:1 calcium-to-phosphorus ratio). Moreover, Hill testified that other than Answers, Initial (Kure brand) and Solutions were the only other companies that sold frozen, raw, fermented pet food. *Id.* at 227-28; *see also id.* at 283 (Hill testifying Solutions' website mentioned it used sardines and white fish in stocks like Answer). Hill testified that by looking at the product panel (ingredients), combined with the guaranteed analysis, calcium-to-phosphorus ratios, and nutrient analysis of a product, he could figure out whether pet food formulas were substantially

---

[20] The trial court acknowledged at the contempt hearing that Hill was "not the best witness" for establishing whether the pet food products of Solutions were identical or substantially similar to those of Answer. *Id.*, 1/24/23, at 233-34.

similar to each other. *Id.* at 272, 275. Hill also testified that Solutions promoted "sourcing claims [like their products were] grass fed, out in pastures [and in] a lot of sunlight" that were very similar to sourcing used by Answers. *Id.* at 285-86.

Ultimately, the trial court did not find Stone or King credible and determined that Stone was responsible for "co-formulating" Solutions' pet products with Kent—specifically prohibited conduct under the permanent injunction—and that King, "almost immediately [after the ruling on the first contempt petition,] began manufacturing whey[-]fermented beef and poultry pet food diets for Solutions using recipes provided by [Lystn's] former plant manager." Trial Court Opinion, 3/1/24, at 24.

First, we must defer to the credibility determinations of the trial court with regard to the witnesses before it. *See Garr*, *supra* at 189 ("We are mindful that this Court defers to the credibility determinations of the trial court with regard to the witnesses who appeared before it, as that court has had the opportunity to observe their demeanor."). Second, we find the language in the permanent injunctive order was "definite, clear, and specific" so as to put Stone and King on notice of exactly what conduct was prohibited. In particular, the injunction prohibited Stone "from consulting for any business [] regarding the development of formulas or food programs for products that are identical or **substantially similar** to those used by Lystn, including fermented goat's milk, raw fermented meat products, raw fermented kefir, fermented bone broths and stocks, and/or fermented tea/kombucha for

animal consumption." Permanent Injunction, 12/12/22, at 2 (emphasis added). In addition, King was ordered to "cease production of Solution's existing whey[-]fermented raw diet products, including the beef, chicken, and/or pork offerings as presently advertised and formulated." *Id.* at 3. As individuals that had been in the pet food business for years working for a direct competitor, Stone and King could have had "no doubt or uncertainty" of the prohibited conduct under the permanent injunction. *Gunther*, *supra*.

After our independent review of the record, including the entirety of the testimony over the two days of contempt hearings, we conclude that the trial court did not err when it found Stone and King in civil contempt for violating the permanent injunction. The evidence showed that Stone, who was advertised at Solutions as their "Principal Food Scientist," was involved in the process of developing its food programs for fermented dog food products substantially similar to that of Answers. Moreover, King, one of the founding members of Initial, was integral in supplying Solutions with whey-fermented products that were added to their company's beef, chicken, and pork formulas.

Finally, Stone asserts that the trial court abused its discretion when it ordered her to pay sanctions, in the form of unreasonable attorneys' fees, that were excessive and "not based upon any relevant factors articulated in *Sutch*[, *supra*]." Stone's Brief, at 7.

"While . . . a court may impose an unconditional fine in civil contempt, it may do so only if the purpose is not to punish but to compensate for losses suffered by the complainant[.]" *Colbert v. Gunning*, 533 A.2d 471, 472 (Pa.

Super. 1987). Moreover, "[a]n unconditional fine for civil contempt can serve two purposes: (1) to punish violators or (2) to deter future or continued violations of the law. The deterrence of continuous or future violations of a court order is a legitimate interest to be served by the levy of an unconditional fine." *Id.* at 473.

In addition, when reviewing a grant of attorney's fees, we will not disturb the decision below absent a clear abuse of discretion. *See, e.g.*, *Brenckle v. Arblaster*, 466 A.2d 1075, 1078 (Pa. Super. 1983); *Shearer v. Moore*, 419 A.2d 665, 669 (Pa. Super. 1980). Because an award of counsel fees "is intended to reimburse an innocent litigant for expenses made necessary by the conduct of an opponent[,]" *American Mut. Liability Ins. Co. v. Zion & Klein, P.A.*, 489 A.2d 259, 262 (Pa. Super. 1985), it is "coercive and compensatory, and not punitive." *See Schnabel Assoc. v. Building and Construction Trades Council of Philadelphia and Vicinity, AFL-CIO*, 487 A.2d 1327, 1338 (Pa. Super. 1985). Thus, counsel fees are a proper element of a civil contempt order. *Id.*; *see Goodman*, 556 A.2d at 1391 n.8.

Here, the trial court concluded that $20,000.00 in attorneys' fees was a reasonable sanction based on a $300.00 blended hourly attorney rate commensurate with the geographical area and comparative skills of the attorneys on the case and considering the fact that the testimony in the matter took place over two full days—without even accounting for out-of-court witness preparation, document review, and other "legal challenges." *See* Contempt Order, 10/12/23, at 4 n.3. Lystn's attorneys stipulated to the

amount of legal fees they would have incurred to represent the company at the contempt proceedings and also introduced into evidence invoices to substantiate those costs. *See* N.T. Contempt Hearing, 3/4/23, at 378-79 (attorneys stipulating their legal fees would have totaled $11,000.00 to represent Lystn at contempt proceeding); *id.* at 380 (Attorney Baldwin entering fee invoice into evidence). *Cf. Sutch*, *supra* (where court based civil contempt sanctions on plaintiff's brief based on discounted version of *quantum meruit* in contingency fee case and essentially double counted costs and fees from first trial). Furthermore, the court found that because Stone had continually violated the permanent injunction, the sanctions imposed were an appropriate measure to coerce her to comply with court orders. We find no abuse of discretion. *Schnabel*, *supra*.

Next, King contends that he is not subject to the injunctive order because he was not a named defendant in Lystn's original contempt petition. King also avers that the court improperly permitted the Lystn Parties to add him as an additional defendant during the contempt proceedings.

We note that even if the court erred in permitting King to be added at a later date, "persons [who] are not parties to [an] injunction order, but its terms are known to them and they are within the class intended to be restrained, [] may not violate the injunction's restrictions." *See Crozer-Chester Med. Ctr. v. May*, 531 A.2d 2, 5 (Pa. Super. 1987) (citation omitted). Here, where King was one of a select number of Amish farmers who comprised Initial's members, and where King either attended or participated

from the beginning of the matter—including the injunctive hearings and trial—and was involved in various proceedings related to motion practice and settlement, we find no error. *See* Trial Court Opinion, 3/1/24, at 22 ("The individual members of Initial, each with equal member interests, are the very actors responsible for the alleged conduct giving rise to the [s]econd [c]ontempt []petition").

Moreover, King was represented by counsel at the contempt proceedings, testified that he knew he was "under an injuncti[on] as part of Initial," N.T. Contempt Hearing, 1/24/23, at 194, and stated that he "knew [he was] under a [permanent] injunction as well." *Id. See Crozer-Chester*, *supra* (contempt proceedings against alleged contemnor where proceedings predicated upon violation of order served on contemnor and entered after full hearing on merits). We conclude that King was "within the class intended to be restricted" by the injunction and was aware of its terms. *See* N.T. Contempt Hearing, 1/24/23, at 77-78 (Stone testifying King, as a Pennsylvania farmer, was a milk supplier for Solutions). Accordingly, he is not entitled to relief.

King next contends that the court erred by *sua sponte* permitting Lystn to amend its contempt petition to include claims against him. King also argues that the amended petition was never properly served upon him by the sheriff.

Pursuant to Pa.R.C.P. 1033, "[a] party . . . by leave of court [] may at any time . . . add a person as a party . . . or otherwise amend the pleading." Pa.R.C.P. 1033(a). "Although the accepted practice favors permitting

amendments, the right to amend is subject to the discretion of the trial court and is properly denied if there is resulting prejudice to the adverse party." *Biglan v. Biglan*, 479 A.2d 1021, 1026 (Pa. Super. 1984).

Again, as noted, King had 44 days to prepare a defense to the amended contempt petition—from the date of the first contempt hearing where he was put on notice that the Lystn companies were seeking contempt against him until the date of the second contempt hearing. Moreover, not only was King represented by counsel at the contempt hearings, but he was also involved in this case from its inception—attending or participating in the injunction proceedings, trial and other related matters. King cannot now claim that he has suffered prejudice as a result of Lystn amending its second contempt petition to include the individual Initial members who, in essence, were "the class intended to be restrained" by the permanent injunction. *Crozer-Chester*, *supra* at 5.

Furthermore, King claims that he was never personally or properly served with the amended second contempt petition, in violation of Pa.R.C.P. 402. However, as Lystn properly points out in its Appellee brief, Rule 402 strictly applies to "original process," not the filing of petitions. *See* Pa.R.C.P. 402(a)(1)-(2)(i-iii) ("**Original process** may be served [] by handing a copy to the defendant[,] by handing a copy [] at the residence of the defendant[,] or at any office[.]") (emphasis added). Any petition for contempt is ancillary

to the original service of process in a matter.[21]  Again, King had ample notice and an opportunity to be heard in the instant contempt proceedings.  Thus, we find no merit to this issue.

Finally, King argues that the trial court erred by finding that he was bound by the injunctive orders where he was not a party to the action, had been denied the opportunity to intervene, and was not specifically named in or restricted by the injunctions.  **See** King's Brief, at 2.  Again, "if persons are not parties to the injunction order, but its terms are known to them and they are within the class intended be restrained, they may not violate the injunction's restrictions."  **Crozer-Chester**, 531 A.2d at 5 (citation omitted).  Therefore, this claim is meritless.

Orders affirmed.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/01/2025

---

[21] King admits he has never been a party to the underlying action, **see** King's Brief, at 2, and, in fact, states that he sought to intervene in the action.  **Id.**